UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARK KINDIG,

                           Plaintiff              DECISION AND ORDER

-vs-
                                                 07-CV-6282 CJS

ANTHEM LIFE INSURANCE COMPANY,

                           Defendant

_____

APPEARANCES

For Plaintiff:                 Michael A. Polozie, Esq.
                                  349 West Commercial Street, Suite 3400
                                  East Rochester, New York 14445

For Defendant:             David T. Luntz, Esq.
                                  Hinman Straub, P.C.
                                  121 State Street
                                  Albany, New York 12207

INTRODUCTION

This is an action to recover long-term disability insurance benefits, brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. Plaintiff, who claims to be disabled due to hip pain, contends that Defendant's decision denying him disability insurance benefits was arbitrary and capricious. Now before the Court is Defendant's summary judgment motion [#9] and Plaintiff's cross-motion [#19] for the same relief. For the reasons that follow, Defendant's application is granted and Plaintiff's application is denied.

1

BACKGROUND

Unless otherwise noted, the following are the facts of this case, viewed in the light most favorable to Plaintiff. In or about November 2002, Plaintiff was hired as Chief Financial Officer by Bozzuto's, Inc., which owns a chain of supermarkets in the New England area. In connection with such employment, Plaintiff was covered by long-term disability insurance purchased from defendant Anthem Life Insurance Company ("Defendant"). The long-term disability policy states: "We [Anthem] have the discretionary authority to determine your eligibility for benefits and to construe the terms of the policy to make a benefits determination." (58).[1] The policy further states:

WHAT DOES DISABILITY MEAN?

Disability means that due to sickness or injury:

1. You are not able to perform some or all of the material and substantial duties of your regular occupation and you have at least a 20% loss in your pre-disability earnings.

OR

2. While you are not able to perform some or all of the material and substantial duties of your regular occupation, you are working in any occupation and have at least a 20% loss in your pre-disability earnings.

(44).

On May 21, 2004, Plaintiff had a surgical replacement of his left hip. On May 28, 2004, Plaintiff's employment with Brozzuto's ended. On July 31, 2004, Plaintiff applied for long-term disability benefits under the subject policy, claiming to be disabled due to pain in his left hip.

---

[1] Unless otherwise noted, citations are to the Administrative Record.

On September 7, 2004, in a telephone conversation with one of Defendant's employees, Plaintiff's wife stated that Plaintiff was able to drive a car, and that he was currently looking for work in the same field as before.

On October 7, 2004, Plaintiff's orthopedic surgeon, Robert Little, M.D. ("Little"), examined Plaintiff and wrote, in a letter to Plaintiff's primary-care physician, Robert C. Pietropaoli, M.D. ("Pietropaoli"), in relevant part as follows:

> [Mr. Kindig] did well for the first month [after surgery] but when returning to a very aggressive rehabilitation program in the Rochester area he noticed some increasing difficulties. He now uses a cane. He states at time [sic] his leg will kind of give out. He has backed off on his exercises and has had some resolution of symptoms.
> ***
> At this time, I believe that his symptom complex is secondary to possibly being a little over-aggressive in physical therapy. I would like to keep a close eye on his hip. He will back off on the PT but can maintain a protocol. I will plan to see him in 2 months to check his progress and update you.

(354).

On October 12, 2004, Defendant approved Plaintiff's application for long-term disability benefits, retroactive to August 2, 2004.

Also in October 2004, Plaintiff began working with a vocational consultant in an effort to obtain a new position as an executive in a large retail chain.

On November 8, 2004, one of Defendant's clinical case managers interviewed Plaintiff by telephone. In a subsequent letter to Plaintiff, Defendant summarized the discussion as follows:

> During this phone interview you indicated you had pain in your left hip but that the pain was improved. You rated your pain as 4 out of 10 and indicated you walk with a cane but that you try not to use the cane. You advised that your daily activities included a home exercise program using weights approximately 45 minutes per day, reading, computer usage, assisting with some household activities and going to the grocery store. You also indicated you travel by car

approximately 335 miles from New York to Connecticut approximately once per month. Finally, you indicated you try to take Ibuprofen when you can and that you had discontinued Vicodin. You advised you take Ultracet as needed or approximately 2-3 times per week.

(335).

On November 9, 2004, Defendant provided Little with a copy of Plaintiff's job description, and asked him to complete a Physical Capacity Assessment form. Little completed only a small portion of the report, and indicated that Plaintiff did not have any visual or hearing impairments, that he was not receiving treatment or medication that would affect his ability to operate hazardous machinery, and that he had no restrictions on his ability to drive. (352). However, Little left most of the form blank. (351-353). On November 16, 2004, Little issued a note stating, "Mark Kindig seen on 10/7/04 by Dr. Little. Patient is not disabled." (333).

On December 13, 2004, Defendant informed Plaintiff that he no longer met the definition of total disability under the policy. (271-274). In that regard, Defendant referenced the aforementioned facts, including Little's statement that Plaintiff was "not disabled." (272). Defendant further stated:

> In order to ascertain whether or not you are capable of performing your own occupation, your file was referred to our Vocational Rehabilitation Consultant. Using the Dictionary of Occupational Titles for Vice President for Private Sector Executives (189.117-034), the primary duties of your occupation are to direct and coordinate activities of one or more departments of a major division of a business organization. This is considered a high level position (SVP 8) and work situations involve performing a variety of duties, directing activities, dealing with people and making judgments and decisions. The occupation is considered sedentary in strength. This is primarily a sitting position with max lifting requirements of 10 lbs.
>
> In conclusion, the vocational and medical evidence confirms that you have the physical capacity to return to work in your own occupation. Consequently, you do not meet the definition of "Disability" under your employer's group

contact.

(273).

Apparently after receiving this notice, Plaintiff returned to see Little. On December 16, 2004, Little examined Plaintiff, and reported that Plaintiff was

> still having quite a bit of difficulty with his left hip. Apparently, I was under the impression that he felt good for a period of time but am now questioning him 4 weeks after surgery. He has had pain involving the anterior aspect of his left hip. He states his pain is increased with weightbearing, although he does have pain at night. He relies on the use of Ultracet to get through the night.

(194). Little stated that, upon examination, Plaintiff had pain when extending his hip. Little further wrote, "I am suspicious that he may have some underlying acetabular [hip socket] loosening." *Id*. Litttle referred Plaintiff for a "diagnostic workup including a bone scan, CBC and sed rate." *Id*.

On January 13, 2005, Little again examined Plaintiff, who claimed to be having "quite a bit of pain" and "quite a bit of difficulty with his left hip." (194). Little reported that "the bone scan does not reveal any increased uptake except at the most lateral aspect of the acetabular in the area of the screw fixation." *Id*. Little stated that based on the bone scan and radiographs of the hip, Plaintiff might have "some impingement as a result of the prominence of the acetabular component." *Id*. Little further stated:

> It is my opinion at this time that Mr. Kindig cannot return to work. Initially when he was seen, since his surgery was done elsewhere, it is reasonable to think that he could return to work after about 3 months from surgery. But now he appears [sic] that his hip replacement has failed him. I am recommending that we continue with a watchful eye. I will plan to see him in 6 weeks. It is quite possible . . . that he will need a revision of the acetabular component.

(195).

Despite Plaintiff's complaints of pain, between December 2004 and February 2005

5

he was actively involved in seeking a new executive position with retail store chains such as Kroger, Winn-Dixie, Loews, Home Depot and Kmart. (230-231). In that effort, Plaintiff retained a vocational consultant and an executive search consultant, and sent his resume to many prospective employers. On February 3, 2005, Plaintiff's vocational consultant noted some of Plaintiff's activities in that regard, which included flying to Boca Raton, Florida, to meet with executives at Winn-Dixie and Publix. (145). The consultant also noted that Plaintiff was ready, willing, and able to return to work. *Id*. ("He has had excellent response to his internet demo on store operations, and is confident that he will eventually land a good position.").

On February 2, 2005, Plaintiff appealed Defendant's decision to terminate his benefits. In support of the appeal, Plaintiff submitted Little's office notes from January 2005.

On March 3, 2005, Little again examined Plaintiff, at which time Plaintiff reported that he was "continu[ing] to have quite a bit of difficulty with is left hip." (168). Plaintiff reported experiencing "decreased endurance" and tenderness in the left groin region. Little had new x-rays taken, which did "not show any obvious abnormality except for some new bone formation on the lateral most placed screw." *Id*. Little observed that "any rotation of [the] hip beyond approximately 20 degrees of internal rotation reproduces pain." *Id*. In conclusion, Little wrote: "I am concerned that whether or not we are dealing with interarticular pathology to hip or referred pain pattern. [sic] I am recommending a hip aspiration arthrogram and this will be accomplished within the next week." *Id*.

Defendant subsequently had Plaintiff's medical records reviewed by a medical consultant, Barry Gendron, D.O. ("Gendron"). On April 25, 2005, Gendron spoke with Little

by telephone, and then sent a follow-up letter which stated, in relevant part:

> You had indicated on 11/16/04 that he was not disabled. However, more recently in January 2005, you did provide information stating that he was totally disabled.
>
> Functionally he has indicated to the insurance company that he is independent in ADLs [activities of daily living] and is able to use the computer, read, watch television, and drive. His daily activities appear to be consistent with at least a sedentary level of function. He is not taking or requiring high-dose narcotic medication. He recently had a left hip arthrogram, but you did not have the specific results to review when I spoke with you.
>
> I indicated that based on my review of the clinical data it would seem that Mark Kindig would be able to sustain activities at least at a sedentary level with occasional position changes. In addition, I noted that he left his job in May of 2004. More recently, he has been working closely with a vocational resource pursuing full-time employment. I indicated that I would share with you Activity Reports from Dan McAneny Associates that reflect the fact that he has contacted 25 former contacts. Mr. Kindig did voluntarily leave his job and has been pursuing inroads with Winn-Dixie and Publix through direct contact as well as through interviews in Florida. It was anticipated [by his consultant] that by the end of the first quarter of 2005 or possibly longer that he would have a job offer. Based on his active pursuit of ongoing employment, it is my assessment that there is insufficient reason to support that he is unable to work, particularly when he is actively pursuing full-time employment.
>
> In summary, Mr. Kindig's ADLs and vocational pursuits support significant functional reserve. Although he does ambulate with a cane, he is still able to stand and walk occasionally. He could pursue employment at a sedentary level with occasional position changes, and he has been able to drive and travel to other states.
>
> If you are in agreement with my summary please retain this for your records. If you support additional restrictions and limitations beyond those I have indicated, or you have additional comments, please provide any new or objective evidence supporting your comments (eg. The left hip arthrogram).

(128-129). On May 5, 2005, Little signed Gendron's report, thereby indicating that he agreed with Gendron's summary. (130).

On May 13, 2005, Defendant denied Plaintiff's appeal. (116-119). In that regard,

7

Defendant noted that, "[o]n May 5, 2005 Dr. Little returned a signed copy [Gendron's letter], indicating his agreement with Dr. Gendron's summary of their conversation, with no changes or modifications." (118). Defendant further stated, in relevant part:

> [V]ocational review of your pre-disability occupation confirms it is classified within the sedentary level in terms of physical demands. The medical documentation currently contained in your file does not support your inability to perform the duties of a sedentary occupation, including that of Chief Financial Officer/Executive Vice President. Your treating physician, Dr. Robert Little[,] has provided his agreement with this position. In the absence of clinical findings to support a condition, which warrants restrictions and limitations of functional capacity such that you would be unable to perform the duties of your sedentary occupation, no benefits are payable beyond December 15, 2004. This is our final decision on your claim.

(119).

More than one year later, on June 15, 2006, Plaintiff filed an application for Social Security Disability benefits. Thereafter, Plaintiff was found completely disabled by the Social Security Administration ("SSA"), and began receiving benefits. In making its decision, the SSA determined that Plaintiff's disability began on April 29, 2004.

On June 6, 2007, Plaintiff commenced the subject action, and on August 1, 2008, Defendant filed the subject motion for summary judgment (Docket No. [#9]). On November 21, 2008, Plaintiff filed a cross-motion for summary judgment (Docket No. [#19]). In support of his application, Plaintiff submitted affidavits from himself, his wife, and Dr. Little. In his affidavit, Plaintiff states that the reason that he could not perform his job was because it required extensive driving. (Mark Kindig Affidavit at ¶ ¶ 6-7). Plaintiff also states that "various representatives of Bozzuto's and of the Defendant insurance company had urged [him] to seek Social Security coverage." *Id.* at ¶ 15. As for Little's affidavit, he states that his notes made on January 13, 2005, in which he indicated that Plaintiff was unable to

8

return to work, "stated [Plaintiff's] continuing and current condition." (Little Affidavit at ¶ 6). However, Little provided no explanation as to why he agreed with Gendron's report on May 5, 2005.

On March 19, 2009, counsel for the parties appeared before the undersigned for oral argument of the motion. The Court has thoroughly considered the parties' written submissions and the arguments of counsel.

## DISCUSSION

*Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see also*, FED. R. CIV. P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Plaintiff brings this action to recover benefits pursuant to 29 U.S.C. § 1132. With respect to this statute, it is well settled that:

> "[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed [by a district court] under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan does grant discretion to the administrator, a court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995).

*Tocker v. Philip Morris Companies, Inc.*, 470 F.3d 481, 487 (2d Cir. 2006). Under the arbitrary and capricious standard, the court must uphold the administrator's decision unless it is "without reason or erroneous as a matter of law," and "[w]here the plan participant and

10

the plan administrator offer "two competing yet reasonable interpretations of [the plan]," [the court] must accept that offered by the administrators." *Id*. at 489 (citations omitted).

In situations "where (as here) the plan administrator is not the employer itself but rather a professional insurance company," "for ERISA purposes a conflict [of interest] exists." *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. 2343, 2349 (2008). When such a conflict exists, " reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits," although, "the significance of the factor will depend upon the circumstances of the particular case." *Id*. at 2346.

In conducting a review using the arbitrary and capricious standard, the Court is limited to the record that was before the plan administrator. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("We follow the majority of our sister circuits in concluding that a district court's review under the arbitrary and capricious standard is limited to the administrative record.").

Under ERISA, "Plan administrators need not give special deference to a claimant's treating physician," although they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 442 (2d Cir. 2006) (citations omitted). Moreover, where a claimant has been found disabled by the Social Security Administration, the court may consider that fact as some evidence of total disability under an ERISA plan. *Id*. ("The court acted well within its discretion when it considered the SSA's findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the SSA's

definition of disability may differ from that in the [ERISA] Plan.").

As for a remedy, "if upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'" *Miller v. United Welfare Fund*, 72 F.3d at 1071 (citations omitted).

In the instant case, all parties agree that the Court must apply the arbitrary and capricious standard of review. That being the case, the Court will only consider materials that were before Defendant when it rendered its decision. The Court will not consider the new affidavits of Plaintiff, his wife, and Little, that were submitted in support of his application for summary judgment. As an aside, the Court notes that such affidavits have little probative value in any event. For example, Plaintiff's affidavit fails to provide a convincing explanation for his extensive job-seeking activities between December 2004 and February 2005. Similarly, Little's recent affidavit, dated September 3, 2008, fails to explain why, in May 2005, he agreed with Gendron's opinion that Plaintiff could work.

Additionally, the Court will not consider the decision of the SSA, finding Plaintiff completely disabled, which was issued more than a year after Defendant's final decision denying coverage, despite Plaintiff's contention that the Court should do so since "various representatives of Bozzuto's and of the Defendant insurance company had urged [him] to seek Social Security coverage." (Mark Kindig Affidavit at ¶ 15). In the *Glenn* decision, relied on by Plaintiff, the Supreme Court considered, as one factor in its analysis, the fact that the defendant employer had assisted the plaintiff in obtaining social security benefits, which the court found to be inconsistent with the employer's conclusion that the plaintiff was capable

of working. *Metropolitan Life Ins. Co. v. Glenn*, 128 S.Ct. at 2346. However, the reasoning of the *Glenn* decision on this point is inapplicable here for several reasons. First, in *Glenn*, the SSA determined that the plaintiff was completely disabled before the employer decided to deny benefits. *See also, Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d at 440 (The plaintiff provided the plan administrator with a favorable SSA determination prior to the plan's denial of benefits). Here, on the other hand, Plaintiff did not even apply for Social Security disability benefits until after Defendant issued its final decision. Additionally, although Defendant directed Plaintiff to apply for disability benefits, that occurred on October 12, 2004, when Plaintiff was receiving long-term disability benefits. (750).[2] It was only later that Defendant determined that Plaintiff was no longer entitled to such payments. Therefore, Defendant's statement regarding Social Security disability is not inconsistent with its subsequent decision to deny benefits, since that decision was based on new information. Accordingly, the Court will not consider the SSA's determination granting social security benefits.

The Court must now determine whether Defendant's decision was arbitrary and capricious, in light of the record that was before it at the time. Based upon the applicable principles of law, the Court finds that Defendant's determination was not arbitrary and capricious. To the contrary, Defendant's decision appears justified in light of the record, including Gendron's opinion, which Little adopted, and the evidence that Plaintiff was actively planning to return to work. Plaintiff alleges that Defendant "ignored" Little's report

---

[2] Defendant's letter instructed Plaintiff to file an application for Social Security disability benefits within 30 days, and explained that if he did not, his Long Term Disability benefits would nevertheless be reduced by the estimated amount of Social Security benefits. (751). For reasons that are unclear, though, Plaintiff did not apply for Social Security benefits until June 15, 2006.

dated January 13, 2005, in which he stated that Plaintiff could not work. (Plaintiff's Memo of Law at 3). However, at the time of that report, Little was not aware that Plaintiff was actually attempting to return to work, nor did he have the benefit of Gendron's report, which discussed the specific exertional requirements of Plaintiff's job. Upon speaking with Gendron and reviewing his report, Little essentially adopted Gendron's assessment regarding Plaintiff's ability to work. Accordingly, Defendant's decision was consistent with Little's opinion given on May 5, 2005, even though Little apparently has now changed his mind.

## CONCLUSION

Defendant's motion for summary judgment [#9] is granted, and Plaintiff's cross-motion for summary judgment [#19] is denied.

SO ORDERED.

Dated:   Rochester, New York
         March 30, 2009

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge